Flaherty v. Atlantic Lumber Co.

JAMES FLAHERTY

*v.*

ATLANTIC LUMBER COMPANY et al.

[Filed August 18th, 1899.]

1. A corporation may act by its agents without giving them authority in writing. It may be bound by acceptance and ratification of the previously unauthorized acts of its agents in the course of its business.

2. The sum demanded and refused payment under paragraph 3 (now paragraph 38) of the Mechanics' Lien act must not, at the time of the demand, refusal of payment and notice to the owner to retain, exceed the sum then actually owing by the contractor to the workman or materialman who makes the demand and gives the notice. The claimant cannot demand payment and serve the notice first, and afterwards give credits on the sum demanded and noticed, which were allowable when demand was made.

3. If the contractor marks a bill for material furnished to the building "approved," signing his name, it is not an equitable assignment of so much of the contract price as is sufficient to pay the bill.

4. When any residue of the contract price remains after payment of the costs, and those statutory notices and equitable assignments which are effective, it belongs to the contractor.

5. The case of *Donnelly* v. *Johnes* in this court, *ante p. 442*, followed on other points.

On bill for interpleader, answers and proofs.

The complainant is the owner of the post-office building at Atlantic City. By a written contract and specifications filed in Atlantic county clerk's office, one Clarence E. Myers agreed to furnish the material and construct the post-office building for the sum of $4,884—payable, $1,500 of it when the window-frames were set, $1,500 when the walls were topped out and $1,884 when the building was finished, or within thirty days thereafter. The contractor covenanted under penalty to finish it by May 1st, 1897. He completed the building according to the agreement, but failed to pay a large number of claims for work done and materials furnished. There remained $1,853.32 of the contract price in the hands of the complainant. The disputing claims unpaid being largely in excess of this sum, the complainant filed his bill of interpleader, to which several answers have been filed, all admitting his equity, and he has paid the $1,853.32 into court in this suit, and has been dismissed, with his costs. The defendants continued the cause, and asserted their several claims under their answers and the proofs offered by them, and submitted the same for final determination after full argument heard.

*Messrs. Godfrey & Godfrey*, for D. B. Ingersoll and Atlantic Lumber Company, defendants.

*Mr. William M. Clevenger*, for Samuel Kears and others, defendants.

*Mr. Harry Wootton*, for Samuel H. French & Company, defendants.

*Mr. Robert E. Stephany*, for Devlin & Maxwell, defendants.

*Messrs. Thompson & Cole*, for Pettit & Company and others, defendants.

Flaherty v. Atlantic Lumber Co.

Grey, V. C.

There are two claims which are disputed and denied the right to participate in the fund by the other claimants. As to the remaining claims, the parties at the hearing admitted the correctness of the amounts of claims and the notices served thereunder, as stated in the bill and answers, without formal proofs; and it was also agreed as to those other claims that the materials and labor furnished and performed actually went into the building in question and that the proper demand was made for payment and refused.

By the construction given by the court of appeals in *Slingerland* v. *Binns, 11 Dick. Ch. Rep. 413*, and *Bayonne Building and Loan Association* v. *Williams, 43 Atl. Rep. 669*, the fifth section of the supplement of 1895 (*Gen. Stat. p. 2074*) was declared to give to workmen and materialmen (subject to the expense of completing the contract work) an inchoate lien *ab initio* upon the liability of the owner to the contractor, which lien becomes perfect only on service of the statutory notice, based on demand and refusal of payment before that liability matures, and expires on such maturity if no notice has been given. This ruling makes it necessary to determine in each case, when a contest arises as to the applicability of installments coming due under the contract, what is the exact time when the liability of the owner to the contractor matures. Before that time the inchoate lien may be perfected by service of notice in conformity to the statute; after that time, so much of the installment which has matured as is not necessary to complete the contract work or to satisfy inchoate liens then perfected by notice, is at the disposal of the contractor and subject to attack by his outside creditors. *Donnelly* v. *Johnes, ante p. 442.*

The moneys in dispute in this cause came to be due under the last installment. By the terms of the contract the building was to be wholly finished on the 1st day of May, 1897. The final installment of 1884 became payable "when the building is finished, it being understood that the final payment shall be made thirty days after this contract is completely finished." There seems to be no dispute that the building was completed, as testi-

fied by the contractor, according to the contract. Thirty days after May 1st, 1897, was May 31st, 1897. At that date the liability of the owner to the contractor for the last installment matured. Up to that time any workman or materialman entitled to give the statutory notice to retain might do so, and thus perfect his inchoate lien; after that date they lost their privilege, and the contractor and his outside creditors might claim so much of the fund as was not needed to complete the contract and to pay the notices served, in compliance with the statute.

The notices served are to be paid in succession, in the order of their service. *Bayonne Building and Loan Association* v. *Williams, supra.*

The first notice was that of Daniel B. Ingersoll, served on April 9th, 1897, one of the two claims, payment of which is disputed. The written notice of Ingersoll was, in its essentials, in conformity to the statute, and gave notice to the owner to retain $872.60. The other claimants defend the fund against Ingersoll's claim upon the ground that " Ingersoll served notice for too much money." The basis of this contention is not that the amount demanded by Ingersoll was not owing to him when demanded, but that, by what the opponents insist were the terms of Ingersoll's contract, it was not, when demanded, payable. This defence rests wholly upon the claim that by the contract between Ingersoll and the contractor, Myers, the price of the bricks which Ingersoll furnished was fixed to be paid at certain specified times, which, the opponents insist, only arrived when Myers got his payments from Flaherty; and they say that on the day when Ingersoll served his notice Myers was not entitled to, and had not received, enough to pay Ingersoll the amount owing to him by $6, and as Myers had not received it Ingersoll had no right to demand it. The argument is exhibited by the following schedule submitted by the counsel opposing Ingersoll's claim :

" Myers' contract with Flaherty was for payment of..................... $4,884 00
"Flaherty paid Myers during March, 1897, the first two payments
    under the contract, $1,500 each ................ ...................... 3,000 00

" Flaherty owed Myers, May 1, 1897............. ............................ $1,884 00

Flaherty *v.* Atlantic Lumber Co.

"Ingersoll furnished bricks up to March 31, 1897, to the value of...   $1,166 60
"Myers paid Ingersoll, March 20, 1897....................................   300 00

$866 60

"This is the amount for which Ingersoll should have served notice, as he sold $6.00 of brick on April 1st.   Under his contract this was not due until May 1st.   April 9th, Ingersoll served notice for $872.60, or for $6 more than was due him, *at that time.*"

It should be noticed that all the bricks had been delivered by Ingersoll more than a week before notice served by him.   The criticism of his claim depends, as stated, wholly upon the assertion that $6 of his demand, though owing to him when noticed, had not then become payable because, by his contract, it was not payable until Myers had received his contract-money, and it is claimed that Myers did not become entitled to receive it until, at the earliest day, May 1st, 1897.

The statement of this argument of Ingersoll's opponents, by the foregoing schedule which seeks to illustrate and enforce it, is not supported by the proofs.   Assume that Ingersoll was to be paid for his bricks as Myers got his contract-money from Flaherty—that is, Ingersoll s bill became due and payable when Myers actually received enough money from Flaherty to pay it. The schedule states that Myers had received from Flaherty during March, 1897, $3,000, a sum largely in excess of Ingersoll's bill for bricks, all furnished during March, except $6 worth on April 1st; but the statement that payments were made to Myers of $3,000 "during March" is largely assumption. Myers was put on the stand to prove when payments were made, and was unable to name the date of a single payment which he received.   He "guessed" the first payment was in March, and "guessed" the second was three weeks after the first.   As the work was only begun on March 4th, and Myers was obliged to get an architect's certificate to entitle him to each payment, and to demand his money from Mr. Flaherty and procure him to pay the amount earned, my impression from the evidence is that the money was paid him (at least the second $1,500) after April 1st, and therefore after Ingersoll had furnished all the bricks for which he now by his stop-notice claims payment.   By this

second $1,500 Myers would have received enough to have fully paid Ingersoll, and thus the latter's money would have been payable under any construction of the contract between Ingersoll and Myers.

But the evidence does not sustain the assertion that, by the contract between Ingersoll and Myers, the time of the payment for the bricks was fixed to depend upon Myers' receipt of his contract-money. The whole matter is based on Ingersoll's statements that he was to be paid "as he [Myers] got his money." There is abundant proof that Myers paid out the moneys he received without regard to what he owed Ingersoll, and neither of them appears to have had any consciousness that the time of Ingersoll's payments was by their contract dependent upon Myers' receipt of his contract price for erecting the building. Myers swears he was receiving money from other work and could not tell what money he received or where it went. When Ingersoll was asked whether he was not to be paid if Myers never received his contract-money, he said there was no agreement to that effect, and yet if the contract was made as claimed, Ingersoll must be held to have agreed that if for any reason Myers failed to receive the moneys due him under the contract, he (Ingersoll) should never be paid—an agreement so unreasonable that it cannot be believed to have been made without strong proof, which is here wanting. There is some appearance of contradiction in the phrasing of Ingersoll's testimony, but when the inquiry was directly put to him, "When did your bill become due?" he answered, "My bills were due when the last bricks went there."

Myers denied that Ingersoll demanded payment, but Ingersoll's testimony supporting his stop-notice, written at the time, declaring that he had made a demand upon Myers and had been refused, is more worthy of belief.

Considering all the proofs, Ingersoll was entitled to the sum he demanded by his stop-notice, and his claim for $872.60 should be allowed.

The next stop-notice served was that of the Atlantic Lumber Company. That company furnished materials for the building

in question, and served a notice upon Flaherty, the owner, on the 23d day of April, 1897, to retain $1,192.19.

This notice is challenged because it was signed "Atlantic Lumber Company, per C. P. Thompson," without showing by any writing what authority Thompson had to make such a demand, and those opposing this claim allege that, because of the absence of such written authority, Myers was justified in refusing payment, and that the notice itself is inefficient.

The doctrine that a corporation may act only by a resolution of its board, and under its corporate seal, has long been abandoned. In the conduct of its ordinary business a corporation acts by its agents, who may be appointed without formal action of its board and not even in writing. *American Insurance Co.* v. *Oakley, 9 Paige 500.* Corporations may be bound by acceptance and ratification of previously unauthorized acts of an agent, even when in the course of his principal's business he perpetrates a fraud. *Garrison* v. *Technic Electric Co., 10 Dick. Ch. Rep. 708.* The notice in this case was given in the name of the company by one who had in the matter in question power to represent it, and the corporation has ever since acted upon and ratified his act. A written authority exhibiting his agency was not necessary to justify either the demand for payment from Myers or the notice in writing to the owner.

There is another criticism of the claim of the Atlantic Lumber Company which is of more significance. The party claiming under paragraph 3 (now paragraph 38) of the lien act cannot sustain his notice if he demands more than is due. *Kirtland* v. *Moore, 13 Stew. Eq. 106.* There must have been a previous refusal to pay by the contractor, and it is quite obvious if the contractor did not owe the sum demanded he had a good ground for his refusal, and the claimant could not ignore it and collect the exorbitant bill from the owner by notice. *Reeve* v. *Elmendorf, 9 Vr. 133.*

The Atlantic Lumber Company, on April 23d, 1897, served on Flaherty, the owner, a notice that $1,192.19 was due it from the contractor, and that it had demanded that sum from him and he had refused payment, and requiring the owner to retain

that sum out of the contract price. It appears that in the manner of making sales by this company, a list of the material to be furnished a building would be made out; sometimes all the goods named on the list would not be used, and sometimes there would be additional material sent or a correction of prices. In the final settlement sometimes the credits for unused goods amounted to more than the extra charges for additional material, or in correction of prices, and sometimes the extra charges to more than the credits. The superintendent of the company testified that in every case while he was in their employ there was a variation. It is quite evident that in such case the amount owing by the contractor could only be definitely ascertained by an adjustment of these items of debit and credit, fixing the final balance to be paid. Until that had been done there could be no proper demand and refusal and no sufficient notice to retain. The testimony and the documentary proofs show, that the demand of payment and refusal by the contractor to pay were made on April 22d or 23d, 1897; the notice to the owner to retain was served on the 23d day of April in that year. The demand was for $1,192.19 and the notice is to retain a like sum. But at this time there was an unadjusted credit outstanding for unused lumber, which was afterwards taken away from the building. The price for this unused lumber was charged in the bill and makes part of the $1,192.19 now claimed. After the notice claiming the $1,192.19 had been served, this credit for unused lumber was, on June 1st, 1897, adjusted at $29.76, and was allowed to the contractor against the $1,192.19 demanded of him and notified to be retained by the owner from the contract price. The testimony and documentary proofs make this absolutely clear. The Atlantic Lumber Company's own written statement, under date of June 1st, 1897, shows that this credit of $29.76 was allowed to the contractor against the $1,192.19 now claimed from the owner. On the 27th day of May, some five weeks after the demand upon and refusal to pay by the contractor, and after the notice to retain had been served on the owner, the contractor marked the bill of the

Atlantic Lumber Company, made out with a total of $1,192.19, as now claimed, " approved."

This is claimed to be an admission that $1,192.19 was the true amount due that company and to be a waiver of all credits. But it can have no force to make the company's notice effectual. First, because if this approval admitted the $1,192.19 to be the true sum due, the adjustment came too late. The cases cited show that the true sum must be ascertained before the demand made, and the notice must not exceed the sum so ascertained. The claimant cannot demand and serve notice first, and afterwards allow credits due when demand was made. Secondly, the contractor's approval was obviously neither an admission that the $1,192.19 was the true sum due, nor a waiver of all other credits, for he afterwards obtained the $29.76 credit to be allowed him for the unused lumber as a deduction from the $1,192.19 now claimed from the fund.

The necessary result follows that the contractor when asked to pay $1,192.19 without the previous adjusting and deducting of the credit of $29.76, may rightfully have refused to pay, and the claimant cannot maintain its notice to the owner demanding payment of a greater sum than was due from the contractor. Its claim must therefore be rejected. *Reeve* v. *Elmendorf, Kirtland* v. *Moore, ubi supra.*

There was a reference on the argument to the supplement of 1895 (*Gen. Stat. p. 2075 ¶ 7*), which prescribes that in all cases journeymen or laborers shall have priority over employers of labor, contractors or materialmen for the payment of wages, without reference to the date when the journeymen or laborers shall have filed their liens or served notice. It is suggested that these labor claims must have preference. In examining the *status* of the claimants the court can look only at the facts shown in the pleadings and proofs. The privilege to be preferentially paid under paragraph 7 (now paragraph 43) of the supplement of 1895 is limited to journeymen and laborers who have served notices for the payment of wages. Whether the claimant was a journeyman or laborer, and whether the notice served was for payment of wages, are matters of fact which must be alleged

and proved to entitle the claimant to the privilege secured him by the statute. Neither the pleadings, the admissions nor the proofs in this case specify that any of the claims were made by laborers or journeymen, nor that they were due for payment of wages. The bill of complaint refers to claims for work and material furnished, without distinguishing that which was for work from that which was for material, and it nowhere states specifically that any claim was for the payment of the wages of a journeyman or laborer, nor does any answer or proof set up such a claim, and for want of such showing they fail to establish their rights to the preference given by paragraph 7 (now paragraph 43) of the supplement of 1895 to journeymen and laborers, and take their places as claimants without special preference under that act.

There remain to be considered the other notices of workmen and materialmen to retain, &c., which are alleged to have been served in conformity to the statute.

In the decision of the court of appeals in *Bayonne Building and Loan Association* v. *Williams,* above cited, it is declared that when the liability of the owner to the contractor under the contract matures, all the inchoate liens of workmen and materialmen not then perfected by proper service of notice expire. This necessarily releases the fund from liability to be retained on statutory notices, and permits the contractor to dispose of it, or his outside creditors to assert their rights in it.

In the case under consideration the liability of the owner, as is above shown, matured May 31st, 1897. No other statutory notice than those of Ingersoll and of the Atlantic Lumber Company was served on or prior to May 31st, 1897. Several were served at various times between June 1st, 1897, and September 11th, 1897. As all of these statutory notices were served after the liability of the owner under the contract had matured on May 31st, 1897, and after the residue of the contract price had been thereby freed from the charge in favor of workmen and materialmen, they all failed to have any effect to compel the owner to retain anything for their payment from the contract price, and all must be rejected as claims upon the residue of the

fund, which had, on May 31st, 1897, come to be at the disposal of the contractor and liable to respond to orders given by him.

The first claim asserted to have operated under an order of the contractor on the owner as an equitable assignment is that of the Atlantic Lumber Company, which, on March 7th, 1897, served on the owner an itemized bill against the contractor, on which the latter had endorsed the words "Approved, Clarence E. Myers." There is nothing on the face of this bill, or its approval, or any other evidence, to show that the contractor, Myers, directed the owner, Flaherty, to pay out of the contract price in his hands, due Myers, the amount of the bill. To approve a bill is one thing; to order it to be paid out of a particular fund is quite a different thing. This claim cannot operate as an equitable assignment, as no intent of the parties that it should so operate anywhere appears. It is therefore rejected.

The next claims on the fund by way of equitable assignment are the two presented by Devlin & Maxwell. These were served upon the owner—the first, on May 24th, 1897, for $188; the second, on May 27th, 1897, for $22.20. They are in the form of bills of Devlin & Maxwell against Myers, the contractor, and have annexed an order by Myers addressed to Flaherty, the owner, directing him to pay the amount of the above bill out of the balance due on the contract for building the post-office, the building in question. These two claims of Devlin & Maxwell were also the subject of a notice served under the statute, but as they were served as notices after May 31st, 1897, when the last of the installment under the contract had matured, they failed as statutory notices as above shown.

The claim of Ingersoll, by the decree herein to be made, will be fully paid, and in this way removed as a charge on the fund. The orders of the contractor become operative to dispose of the residue of it, and these two presented by Devlin & Maxwell are efficient as equitable assignments, and should be paid next after the costs and the Ingersoll claim.

All the statutory notices except Ingersoll's failed for the reasons above stated. No other effectual equitable assignments

than those of Devlin & Maxwell appear in the case. No other charge upon the fund is alleged in the bill of complaint, and if there be any residue remaining after payment of the costs of this suit and the claims of Ingersoll and of Devlin & Maxwell, it is still at the disposal of Myers, the contractor, and should be paid to him. *Hall* v. *Baldwin, 18 Stew. Eq. 866.*

I will advise a decree in accordance with the above views.